UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATHAN EISENBISE, JENIFFER EISENBISE,<br><br>                              Plaintiffs,<br><br>v.<br><br>CROWN EQUIPMENT CORPORATION, CROWN LIFT TRUCKS,<br><br>                              Defendants. | Case No.: 15-CV-0972-AJB-WVG<br><br>**ORDER:**<br><br>**(1) DENYING DEFENDANT'S MOTION TO EXCLUDE FRED SMITH, (Doc. No. 59);**<br><br>**(2) DENYING DEFENDANT'S MOTION TO EXCLUDE EUGENE VANDERPOL II, (Doc. No. 62);**<br><br>**(3) GRANTING DEFENDANT'S MOTION TO EXCLUDE MICHAEL FREEMAN, (Doc. No. 61); AND**<br><br>**(4) DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, (Doc. Nos. 63, 65)** |

Presently before the Court are Defendant Crown Equipment Corporation's ("Crown") three motions to exclude Plaintiffs Nathan Eisenbise's ("Nathan") and Jeniffer Eisenbise's (collectively, "Plaintiffs") experts, (Doc. Nos. 59, 61, 62), as well as Crown's

motion for summary judgment, (Doc. Nos. 63, 65). Plaintiffs oppose all four motions. (Doc. Nos. 69–71, 81.) A hearing on the motions to exclude was held on May 11, 2017. As set forth below, the Court **DENIES** Crown's motions to exclude Smith and Vanderpol and **GRANTS** Crown's motion to exclude Dr. Freeman.

At the hearing, the parties discussion also addressed issues key to Crown's summary judgment motion. Having considered those arguments, as well as those contained in the parties' moving papers, and pursuant to Local Civil Rule 7.1.d.1, the Court finds the matter suitable for decision without further oral argument. Accordingly, the Court hereby **VACATES** the hearing currently set for ***June 15, 2017, at 2:00 p.m. in Courtroom 4A***. The Court **DENIES** Crown's motion for summary judgment.

## BACKGROUND

The facts giving rise to this lawsuit are simple and largely undisputed. Crown designs and manufactures lift trucks or forklifts. (Doc. No. 65-3 at 4; Doc. No. 81-6 at 3.)[1] The forklift at issue in this case is a Crown RC5535-30 ("RC5500"). (Doc. No. 63-1 at 5; Doc. No. 81 at 7.) The RC5500 is a side-standing operator, counterbalanced forklift designed for use "in congested areas full of products, equipment and pedestrians around any corner." (Doc. No. 65-3 at 5; Doc. No. 81-2 at 2; Doc. No. 81-6 at 4–5.)

The RC5500 has four wheels that are arranged like the wheels on a tricycle. Two "drive" wheels are located on opposite sides at one end of the forklift next to the forks. (Doc. No. 81-3 at 2.) Two tandem "steer" wheels, attached to each other on a single steering unit, are off-centered on the other end of the forklift. (*Id.*) The RC5500 weighs approximately 8500 pounds unloaded and can carry approximately 3000 pounds. (Doc. No. 81-6 at 15–16.) There is approximately 4000 pounds of downward force on the steer wheels. (*Id.* at 14.)

The RC5500 is the third design in Crown's RC forklift series, immediately

---

[1] The Court cites to the blue CM/ECF-generated document and page numbers located at the top of each page.

succeeding the RC3000. (*Id.* at 31.) Both the RC5500 and RC3000 have a steel wrap-around skirt around the base of the forklift. (Doc. No. 65-3 at 5; Doc. No. 65-4 at 2; Doc. No. 81-3 at 1.) There is approximately four inches of clearance between the bottom of the skirt and the ground. (Doc. No. 81-3 at 5.) The RC3000's skirt wraps all the way around the forklift, in contrast to the RC5500's skirt, which has a half-moon shaped opening around the steer wheels ("steer wheel opening" or "opening"). (Doc. No. 65-4 at 2; Doc. No. 81-3 at 1–7, 11.) The opening is approximately 11 inches tall by 11.5 inches wide. (Doc. No. 81-3 at 5–6.)

The RC5500 is designed so that it may be operated in both a "forks first" and "forks trailing" direction. (Doc. No. 81-4 at 2–3; Doc. No. 81-5 at 2.) When operated forks first, the RC5500 travels in the direction of its forks. (*See id.*) When operated forks trailing, the RC5500 travels in the direction opposite of its forks, thus traveling with the forks behind the lift. (*See id.*) Significant to this case, when the RC5500 is traveling in the forks trailing direction, the steer wheel opening and steer wheels are at the leading edge of the RC5500. (*See* Doc. No. 81-3 at 2–7.)

On February 14, 2013, Nathan worked as a receiving manager at Costco Wholesale Warehouse located in La Mesa, California. (Doc. No. 65-1 at 10–11.) That day, a coworker, Gabriel Manrique ("Manrique"), was using an RC5500 to deliver pallets of televisions from the warehouse to a Federal Express truck parked at the bottom of a loading ramp. (Doc. No. 65-7 at 15–19.) Nathan stood to the right of the warehouse's rollup door while Manrique loaded the first pallet, took it to the FedEx truck, and returned to load the second pallet. (Doc. No. 65-1 at 20; Doc. No. 81-17 at 6.) After Manrique loaded the second pallet and drove it out of the warehouse and down the loading ramp, Nathan walked partway down the ramp to count pallets of recyclables stacked along one side of the ramp. (Doc. No. 65-1 at 29–30.) Nathan watched Manrique load a second pallet of televisions on the truck before Nathan turned his attention to counting the pallets of recyclables. (*Id.* at 30.)

After Nathan finished counting the pallets on that side of the ramp, he pivoted to his right (toward the bottom of the ramp where the truck was) to count the pallets on the other

side of the ramp. (*Id.* at 31.) At that point, Nathan became aware of the RC5500 Manrique operated when the forklift came into contact with him. (*Id.* at 32; Doc. No. 81-10 at 6.) Nathan was knocked to the ground. (Doc. No. 81-10 at 6.) While traveling in the forks trailing direction up the ramp, Manrique looked back toward the FedEx driver (away from his direction of travel) in response to the driver saying something to him. (Doc. No. 65-7 at 20.) When Manrique turned to look in the direction of travel, Nathan was "already there." (*Id.* at 20.) Manrique stopped the RC5500; unfortunately, the forklift's steer wheels came to a stop on top of Nathan's right foot. (Doc. No. 81-10 at 6; Doc. No. 81-17 at 12.)

Nathan's injuries were significant: his right foot was almost flattened, the bones were crushed, his toes were dislocated and crushed, and the tissues were damaged. (Doc. No. 81-11 at 3; Doc. No. 81-12 at 1.) Despite multiple surgeries, Nathan suffered from chronic pain and constant sores on his right foot. (Doc. No. 81-10 at 10–13.) Ultimately, Nathan underwent a below-the-knee amputation. (*Id.* at 14.) Nathan still suffers from hip and back pain. (*Id.* at 14–15.)

Plaintiffs instituted this action on February 6, 2015, in San Diego Superior Court. (Doc. No. 1 ¶ 1.) In the operative complaint, Nathan alleges two causes of action for design defect, one asserting strict liability and the other negligence. (Doc. No. 21 ¶¶ 18–41.) Plaintiffs assert the steer wheel opening is a design defect that proximately caused Nathan's injuries. (*Id.* ¶¶ 21–23, 35.) Jeniffer also brings a claim for loss of consortium. (*Id.* ¶¶ 42–46.) Crown removed the action to this Court on April 30, 2015. (Doc. No. 1.) On February 24, 2017, Crown filed the instant motions to exclude Plaintiffs' expert witnesses and for summary judgment. (Doc. Nos. 59, 61–63, 65.) All matters have been fully briefed. A hearing was held on May 11, 2017, and this order follows.

## DISCUSSION

### I. *Motions to Exclude Expert Testimony*

Crown seeks to exclude three of Plaintiffs' expert witnesses, Fred Smith ("Smith"), Eugene Vanderpol II ("Vanderpol"), and Dr. Michael Freeman ("Dr. Freeman"). (Doc. Nos. 59, 61, 62.) Plaintiffs designated Smith to opine on the reasonableness of care Crown

used in designing the RC5500 and the existence of feasible safer alternative designs, (Doc. No. 59-6 at 6), Vanderpol to opine on the biomechanical cause of Nathan's injury and the efficacy of alternative designs, (Doc. No. 62-3 at 2, 5), and Dr. Freeman to opine on the likelihood of Nathan's injury had the RC5500 been designed differently and to provide epidemiologic characteristics of forklift-related injuries generally, (Doc. No. 61-8 at 4).

### A.   Legal Standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

*Id.* "The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 JM (AJB), 2007 WL 935703, at *4 (S.D. Cal. Mar. 7, 2007).

Prior to admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). The trial court acts as a "gatekeeper" by making a preliminary determination of whether the expert's proposed testimony is not only relevant but reliable. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014). This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevance prong). *Daubert*, 509 U.S. at 592–93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

A district court has broad latitude in deciding how to measure reliability and in

making the ultimate reliability determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999). In essence, the Court must determine whether the expert's work product amounts to "good science." *Daubert*, 509 U.S. at 593. In *Daubert*, the Supreme Court outlined factors relevant to the reliability prong, including (1) whether the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error; and (4) whether the theory or methodology employed is generally accepted in the relevant scientific community. *Id.* at 593–94. As later confirmed in *Kumho Tire*, "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." 526 U.S. at 141–42.

Under the relevance or "fit" prong, the testimony must be "'relevant to the task at hand,' i.e., that it logically advances a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1315 (9th Cir. 1995) (quoting *Daubert*, 509 U.S. at 597). Relevance requires opinions that would assist the trier of fact in reaching a conclusion necessary to the case. *See Kennedy*, 161 F.3d at 1230. In general, the *Daubert* analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's ultimate conclusions. *Daubert*, 509 U.S. at 595. However, the Supreme Court has cautioned that "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997). As such, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

## B.     Fred Smith

Crown attacks Smith's qualifications only to the extent it asserts that Smith is not qualified to opine on the reasonableness of Crown's design process. (Doc. No. 59-1 at 21–23.) Specifically, Crown contends that Smith is not qualified to opine of the reasonableness of the design process that resulted in the RC5500 because Smith has no knowledge of what lift truck drivers analyze and evaluate during the process, has never been employed by a

company that designs or manufactures lift trucks, and has never designed any component part of a lift truck. (*Id.* at 22.)[2]

Having reviewed Smith's curriculum vitae and deposition testimony, the Court finds that Smith's ample education and experience in mechanical engineering render him qualified to offer an opinion on the reasonableness of Crown's design process. Smith is a registered professional mechanical engineer in California, Nevada, and Alabama, and a registered professional structural engineer in Utah. (Doc. No. 59-6 at 6, 52.) He has over thirty years of mechanical design experience, during which he has designed numerous types of equipment, including material handling equipment, trucking equipment, trailers, aerial lifts, refuse equipment, and tarping systems. (*Id.* at 7, 52.)

Significantly, the three-step risk assessment on which Smith opines is not unique to forklifts. (Doc. No. 69-2 ¶ 4.) This assessment consists of the following: "1) understand the intended use of a truck and identify hazards that could result from that use; 2) if a hazard or danger is identified, assess what can be done [to] create a design that removes or guards against the hazard; [and 3)] if you can't safeguard against the risk, warn about it through instructions for use, training, and warnings." (*Id.* ¶ 8; *see* Doc. No. 69-5 at 31–34.) Because this risk assessment process is not specific to forklift design, and because it is a process with which Smith (as a mechanical engineer and certified safety professional) is intimately familiar, the Court finds he is qualified to offer the proffered opinion. In short, "[t]he fact that [Smith] is not an expert specifically in [forklift design] does not, in view of his other [engineering] experience, disqualify him . . . ." *Casey v. Ohio Med. Prods.*, 877 F. Supp. 1380, 1383 (N.D. Cal. 1995); *see Ramirez v. ITW Food Equip. Grp., LLC*, --- F. App'x ---, 2017 WL 1229739, at *4 (9th Cir. 2017) ("The district court excluded Bennett's opinions because he lacked familiarity with the grinder 'in its intended, pristine condition' and had

---

[2] To the extent Crown attacks Smith's qualifications to render any opinion in this case due to lack of experience with forklifts, as defense counsel seemed to suggest at oral argument, the Court rejects this assertion for the reasons discussed in the following paragraphs.

no 'experience with commercial food equipment.' But the 'lack of particularized expertise goes to the weight accorded [an expert's] testimony, not to the admissibility of her opinion as an expert.'" (quoting *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993))).

Smith proposes three alternative designs to the RC5500 that he contends would have prevented Nathan's injury. The first design involves attaching a cover plate to the guard skirt with three bolts ("cover plate"). (Doc. No. 59-6 at 29.) The end result is that when the cover plate is attached, the guard skirt wraps around the RC5500 in its entirety, much like the RC3000's skirt. The second design involves attaching a two-inch steel or rubber bumper guard to the skirt ("bumper"). (*Id.* at 32.) The third design involves attaching a moveable guard to the steer wheel support ("moveable guard"). (*Id.* at 35.)

Crown seeks to exclude Smith's testimony as to these designs. Specifically, Crown asserts that Smith's opinion as to the cover plate and bumper is unreliable because he failed to test the designs. (Doc. No. 59-1 at 16–18.) While Smith tested the moveable guard, Crown contends the testing conducted is unreliable and irrelevant. (*Id.* at 18–21.) As explained in the following paragraphs, the Court finds these objections each go to the weight rather than the admissibility of Smith's testimony. *See Kennedy*, 161 F.3d at 1230–31 ("Disputes as to the strength of [an expert's] credentials, faults in his use of [a particular] methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony." (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995)) (alterations in original)).

Crown's first objection contends that Smith's failure to create and test the cover plate and bumper are fatal to the evidence's admissibility. (Doc. No. 59-1 at 16–17.) With respect to the cover plate, Smith created a plate that is thinner in design than the one he posits as an alternative design. (Doc. No. 59-6 at 30–31.) He then took photographs of a boot similar to the one Nathan wore and placed it next to the RC5500 at various angles, including the angle Nathan's foot was in when it contacted the steer wheels. (*Id.* at 31.) With respect to the bumper, Smith taped a bumper made of foam to the RC5500 and placed the boot next to it at various angles. (*Id.* at 32–34.)

To the extent Crown takes issue with Smith's demonstrations of the cover plate and bumper, such criticism goes to how much weight the jury will ultimately give to Smith's testimony and whether the testimony satisfies Plaintiffs' prima facie burden of proof. The decisions in *Ramirez v. Hobart Corp.*, No. CV-12-10023-AJB (AGRx), 2015 WL 10939541 (C.D. Cal. Feb. 18, 2015), and *Ramirez v. ITW Food Equipment Group, LLC*, 2017 WL 1229739, are instructive. In this products liability case involving a meat grinder, the district court granted the defendant's motions to exclude the plaintiff's expert witnesses, an electrical engineer and mechanical engineer. *Ramirez*, 2015 WL 10939541, at *1, *5–14. The mechanical engineer, Ned Wolfe, opined that the grinder was defective in design for lacking a clamp lock that would have prevented anyone from opening the lid until electrical current in the unit was off. *Id.* at *12. The district court excluded this opinion, finding Wolfe's opinion to be "unreliable because Wolfe has not sufficiently designed or tested the proposed alternative design[.]" *Id.* The court also faulted Wolfe for "not subject[ing] the proposed design to peer review [and] not demonstrat[ing] that the proposed design has gained general acceptance in the scientific community." *Id.*

A panel of the Ninth Circuit reversed the district court on all counts, concluding that excluding Wolfe—and the electrical engineer—was an abuse of discretion:

> [T]he reliability of an expert's theory turns on whether it "can be tested," *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1197 (9th Cir. 2014), not whether he has tested it himself. Wolfe's alternative design was *capable* of being tested; ITW simply chose not to do so, despite bearing the burden under the risk-benefit test to prove that adapting the solenoid clamp lock to the grinder was not feasible.

> Nor could Wolfe be excluded for failing to subject the proposed design to peer review. Exclusion of experts due to lack of peer review reflects a rote, mechanical application of Rule 702 that this court has rejected in products liability cases where "[p]eer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) *as amended* (Apr. 27, 2010); *White v. Ford Motor Co.*, 312 F.3d 998, 1007 (9th Cir. 2002), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003).

*Ramirez*, 2017 WL 1229739, at *4.

The Court is persuaded by the panel's analysis. Like Wolfe and his proposed design, the cover plate, bumper, and moveable guard are certainly capable of being tested. That Crown chose not to do so, despite bearing the burden under the risk-benefit test to prove that safer alternative designs are not feasible, is not a basis for excluding Smith. That Smith's designs were not subjected to peer review is similarly not a basis for exclusion.[3]

Crown's second objection contends that Smith's testing of the moveable guard is unreliable because the test rig utilized does not accurately reflect what would happen to a human body coming in contact with the RC5500, Smith's testing did not consider whether the design would have caused Nathan to suffer a different injury, and the testing did not approximate the speed and distance of travel that occurred during the accident. (Doc. No. 59-1 at 18–20.) These contentions, however, do not warrant exclusion under Rule 702. "The impact of imperfectly conducted laboratory procedures [is] approached more properly as an issue not going to the admissibility, but to the weight of the [] evidence." *United States v. Chischilly*, 30 F.3d 1144, 1154 (9th Cir. 1994), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008, 1019–20 (9th Cir. 2014)). To the extent Crown attacks Smith's methodology, such contentions and possible flaws can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Primiano*, 598 F.3d at 564 ("Shaky but

---

[3] Crown also asserts that neither the cover plate nor the bumper would prevent a foot from coming in contact with the steer wheels in all circumstances. (Doc. No. 59-1 at 16, 19–20.) As addressed below, it is not Plaintiffs' burden to present fail-proof designs. *See infra* Discussion Section II.B.1. In fact, it is not Plaintiffs' burden to present feasible alternative designs at all; rather, it is Crown's. *Ramirez*, 2017 WL 1229739, at *2 ("the feasibility of alternative safety devices is irrelevant under the consumer-expectations test and, under the risk-benefit test, the *defendant* bears the burden to prove the lack of feasible safety devices" (citing *Chavez*, 207 Cal. App. 4th at 1303) (emphasis in original)).

admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion."); *Johns v. Bayer Corp.*, No. 09cv1935 AJB (DHB), 2013 WL 1498965, at *10 (S.D. Cal. Apr. 10, 2013) (overruling objections to expert who "did not review actual product labels before forming his opinions" because such potential flaws to the expert's methodology "can be addressed through the presentation of contrary evidence and vigorous cross-examination").

Finally, that Smith "did not identify any other similar lift trucks with any of his proposed alternative designs" does not subject him to exclusion. (Doc. No. 59-1 at 22.) Plaintiffs are "not required to show that an alternative, safer design is already used in similar products or has gained industry acceptance," *Ramirez*, 2017 WL 1229739, at *3, given that a product's compliance with "industry custom or usage is irrelevant to the issue of defect" in a strict products liability case, *Grimshaw v. Ford Motor Co.*, 119 Cal. App. 3d 757, 803 (1981). As such, Smith "is not required to have experience with that safer design in such products. Otherwise, 'there could be no first case demanding improvement of an unsafe (but widely accepted) product design.'" *Ramirez*, 2017 WL 1229739, at *3 (quoting *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 863 (9th Cir. 2011)).

In short, the Court finds Smith's methodology underlying the design and testing of the cover plate, bumper, and moveable guard to be reliable. In rendering his opinion, Smith applied well-established engineering principles, methods, and techniques. As evidenced by the multiple examples of safety devices used to prevent access to the wheels on railroad cars and buses, the ideas that Smith proffers here are not new. (Doc. No. 69-2 ¶¶ 6–7.)

The Court also finds Smith's testimony to be relevant. Smith's opinions will assist the jury in determining whether Plaintiffs can carry their prima facie burden of establishing that the design of the steer wheel opening or lack of a safety device proximately caused Nathan's injury, whether Plaintiffs can rebut Crown's evidence on the risks and benefits of the RC5500's design, and whether Crown exercised reasonable care in designing the RC5500. *See Daubert*, 45 F.3d at 1315; *see also Guidroz-Brault v. Miss. Pac. R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001) (finding locomotive engineer's testimony on the appropriate

lookout procedure relevant because it was a key issue in the case). For all these reasons, the Court **DENIES** Crown's motion to exclude Smith.

### C.     Eugene Vanderpol II

Crown also seeks to exclude Vanderpol. (Doc. No. 62.) Vanderpol is a biomechanical engineer who offers two opinions: (1) the steer wheel opening allowing access to the crush point between the steer wheel and the ground was the biomechanical cause of Nathan's injury; and (2) a safety device preventing access to the crush point would have prevented Nathan's injury. (Doc. No. 62-3 at 5; Doc. No. 81-15 at 7.) Crown makes no argument that Vanderpol is not qualified to proffer the opinions he makes. Having reviewed Vanderpol's curriculum vitae, the Court finds that he is. Instead, Crown asserts Vanderpol must be excluded because his opinion is based entirely on the testing Smith conducted. (Doc. No. 62-1 at 12–15.) As set forth in the preceding section, the Court finds Smith passes muster under Rule 702 and *Daubert*. *See supra* Discussion Section I.B. Because Crown's motion to exclude Vanderpol is predicated entirely on the exclusion of Smith, the Court **DENIES** this motion as well.

### D.     Dr. Michael Freeman

Lastly, Crown seeks to exclude Dr. Freeman. (Doc. No. 61.) Dr. Freeman is a forensic epidemiologist who offers an opinion as to whether Nathan would have been as likely to have sustained the same type of injury had the RC5500 been designed differently and the likelihood of the type of injury Nathan suffered from contact with the steer wheels.[4] (Doc. No. 61-8 at 4.) Freeman also offers a statistical analysis of lower extremity injuries involving the steer wheels of the RC5500 versus its predecessors, as well as epidemiologic characteristics of forklift-related injuries. (*Id.*) Crown classifies Dr. Freeman's analysis and

---

[4] "The field of epidemiology addresses the incidence, distribution and etiology (causation) of disease in human populations by comparing individuals exposed to a particular agent to unexposed individuals to determine whether exposure increases the risk of disease." *In re Silicone Gel Breast Implants Prods. Liab. Litig.*, 318 F. Supp. 2d 879, 892 (C.D. Cal. 2004) (citation omitted).

opinions as falling into two categories: the "general" opinion and the "case-specific" opinion. (Doc. No. 61-1 at 13.) Crown seeks to exclude both categories.

### 1. General Opinion

Dr. Freeman's report begins by analyzing several reports of general accident data involving forklifts and other powered industrial vehicles: data from the Occupational Safety and Health Administration ("OSHA") that there were approximately 96,000 annual injuries involving forklifts between 1981 and the 1990s, various studies demonstrating that a significant percentage of accidents involving forklifts involve a forklift striking a pedestrian, and analysis of emergency room records of forklift-related injuries. (Doc. No. 61-8 at 8–10.)

Crown seeks to exclude Dr. Freeman from testifying to the foregoing, asserting this testimony is irrelevant and will only mislead and confuse the jury. (Doc. No. 61-1 at 14.) The Court agrees. Dr. Freeman readily admits that the OSHA statistics are not limited to standup forklifts like the RC5500, but include all kinds of forklifts. (Doc. No. 61-7 at 13.) Nor are they limited to the type of injury Nathan suffered. (*Id.*) Astonishingly, it is of no consequence to Dr. Freeman's presentation of the OSHA statistics whether the injury involved a pedestrian being run over by a forklift or "an operator step[ping] off of a forklift and wrench[ing] his back . . . ." (*Id.*) It is readily apparent to the Court that such disparate and distinguishable data are irrelevant to the instant case. *See Kloepfer v. Honda Co.*, 898 F.2d 1452, 1458 (10th Cir. 1990) (finding trial court did not abuse its discretion in excluding government reports on accidents involving all-terrain vehicles where the reports "were not limited to three-wheeled vehicles, did not relate to an investigation into this accident or to the Honda model involved herein, but rather accidents, injuries and statistics involving all all-terrain vehicles manufactured by over twenty manufacturers").

The other reports and studies analyzed are arguably less irrelevant, having been limited to injuries suffered by pedestrians, to standup forklifts, and/or lower extremity injuries. (Doc. No. 61-8 at 8–10.) However, they are not limited enough to "ha[ve] any tendency to make a fact [of consequence in determining the action] more or less probable

than it would be without the evidence[.]" Fed. R. Evid. 401. It is of no significance to this case whether pedestrians in general are injured by forklifts of unknown manufacturers. It is undisputed that working around powered industrial vehicles weighing several thousand pounds is potentially hazardous. But the RC5500 is not under scrutiny here simply because it is a forklift. Because Dr. Freeman's general opinion has no bearing on whether the RC5500's design proximately caused Nathan's injury or whether Crown was negligent in its design process, the Court finds that portion of Dr. Freeman's testimony fails to pass muster under the relevance prong of *Daubert*.

### 2.    Case-Specific Opinion

Dr. Freeman next offers the case-specific opinion. Dr. Freeman relied on the testimony of Ronald Grisez, Crown's Director of Product Safety, who testified that 77,000 Crown forklifts were sold over 44 years and have been used for a total of 1.2 billion hours of operation. (Doc. No. 61-8 at 11; Doc. No. 63-5 at 2.) Grisez further testified that there are 28,000 forklifts currently in use. (Doc. No. 61-8 at 12.) Based on these figures, Dr. Freeman assumed each forklift has a useful life of nine years. (*Id.*) Considering this assumption in light of Grisez's testimony and the amount of time the RC5500 has been available relative to the preceding models, Dr. Freeman calculated that 101,920,000 of the 1.2 billion hours of operation are attributable to the RC5500, with the remaining 1,081,080,000 hours attributable to the preceding models. (*Id.*)

Dr. Freeman next compared this breakdown in hours of use to incidents involving a Crown forklift's steer wheels and a pedestrian's lower extremity. (*Id.*) Crown identified a total of six such incidents, including Nathan's. (Doc. No. 70-10 at 16.) Based on the foregoing, Dr. Freeman rendered the following opinion:

> Comparing the risk of serious lower extremity injury for the [RC5500] versus [its predecessors], based on number of injuries versus hours of use, yields a risk ratio of 10.6 [], a statistically significant value.
>
> This value indicates that, all other injury risk factors being equal, when a serious lower extremity injury occurs with [an RC5500] (*i.e.* without the [RC3000's guard skirt]) that the cause of the injury is the less safe design in

9.6 out of 10.6 cases, or 90.6% of the cases."

(Doc. No. 61-8 at 12.)

Crown objects to Dr. Freeman's case-specific opinion, asserting it is irrelevant, unreliable, and will mislead the jury. (Doc. No. 61-1 at 21–29.) First, Crown argues Dr. Freeman's methodology is flawed because he uses the total hours of operation as opposed to the number of pedestrians exposed to the risk. (*Id.* at 22–23.) Second, Crown asserts Dr. Freeman failed to identify the potential error rate or cite to authority or peer-reviewed literature to support the contention that the methodology employed is generally accepted in the scientific community. (*Id.* at 24–25.) Third, Crown contends Dr. Freeman's use of five incidents not established as being substantially similar to the incident at issue here renders his opinion unreliable. (*Id.* at 25–29.)

The Court finds Crown's first objection goes to the weight rather than the admissibility of Dr. Freeman's testimony. *See Kennedy*, 161 F.3d at 1230–31; *Chischilly*, 30 F.3d at 1154. To the extent Crown attacks Dr. Freeman's use of the hours of operation versus number of pedestrians exposed to the forklifts, such contentions and possible flaws can be addressed through the presentation of contrary evidence and vigorous cross-examination. *See Daubert*, 509 U.S. at 596; *Primiano*, 598 F.3d at 564; *Johns*, 2013 WL 1498965, at *10.

Crown nonetheless argues that Dr. Freeman's failure to use the proper variables, or to account for explanatory variables, renders his testimony inadmissible. (Doc. No. 61-1 at 22–23.) "[A] statistical study that fails to correct for salient explanatory variables, or even to make the most elementary comparisons, has no value as causal explanation and is therefore inadmissible in a federal court." *United States v. Artero*, 121 F.3d 1256, 1262 (9th Cir. 1997) (quoting *People Who Care v. Rockford Bd. of Educ.*, 111 F.3d 528, 537–38 (7th Cir. 1997)). However, there is no reason to think that the variables Crown identifies— whether a forklift had "10,000 hours of operation in a refrigerated warehouse with no pedestrian traffic" as opposed to one that had "100 hours of operation in a busy warehouse, like a Costco, Home Depot or Walmart," (Doc. No. 61-1 at 23)—are salient within the

meaning of *Artero*. In *Duren v. Missouri*, 439 U.S. 357, 365–66 (1979), "there was no reason to doubt the usefulness of comparing the percentage of women summoned for jury service to the percentage in the district, because there is no reason to think women would be disproportionately ineligible to serve on juries." *Artero*, 121 F.3d at 1262. Similarly here, there is no reason to assume that pedestrian exposure changed significantly between the various Crown forklift models such that Dr. Freeman's reliance on hours of operation is unreliable. And, as noted above, Crown can hash this issue out at trial through the presentation of evidence and cross-examination.

Crown's second objection is easily dispatched. As Dr. Freeman explains, the term "statistically significant," as used in his report, "quantif[ies] potential error." (Doc. No. 70-2 ¶¶ 13–14.) Concerning the methodology used, Dr. Freeman applied methods "consistent with those outlined in the <u>Reference Guide on Epidemiology</u>, from the <u>Reference Manual on Scientific Evidence</u>, published by the Federal Judicial Center as a publication of the National Academics of Science (3rd Edition, 2011), as well as in the text <u>Forensic Epidemiology: Principles and Practice</u>, published by Elsevier (2016)." (Doc. No. 61-8 at 5; Doc. No. 70-2 ¶ 15.)

Crown's final objection is more concerning. Crown contends Dr. Freeman's use of the five other incidents without establishing they are substantially similar to the accident at bar renders his testimony on causation inadmissible. (Doc. No. 61-1 at 25–29.) "A showing of substantial similarity is required when a plaintiff attempts to introduce evidence of other accidents as direct proof of negligence, a design defect, or notice of the defect." *Cooper v. Firestone Tire & Rubber Co.*, 945 F.2d 1103, 1105 (9th Cir. 1991). The underlying concern is that "evidence of dissimilar accidents lacks the relevance required for admissibility under Federal Rules of Evidence 401 and 402." *Id.* "Substantial similarity depends upon the underlying theory of the case. Evidence proffered to illustrate the existence of a dangerous condition necessitates a high degree of similarity because it weighs directly on the ultimate issue to be decided by the jury." *Younan v. Rolls-Royce Corp.*, No. 09cv2136-WQH-BGS, 2013 WL 1899919, at *9 (S.D. Cal. May 7, 2013)

(quoting *Four Corners Helicopters, Inc. v. Turbomeca, S.A.*, 979 F.2d 1434, 1440 (10th Cir. 1992)). "The requirement of substantial similarity is relaxed, however, when the evidence of other incidents is used to demonstrate notice or awareness of a potential defect. Any differences in the accidents not affecting a finding of substantial similarity go to the weight of the evidence." *Id.* (quoting *Four Corners Helicopters, Inc.*, 979 F.2d at 1440).

What little is known of the five other incidents is contained in Crown's accident reports.[5] (Doc. Nos. 81-8, 81-9.) In two incidents, the pedestrian whose foot came into contact with the steer wheels is described as having walked into the forklift. (Doc. No. 81-8 at 1; Doc. No. 81-9 at 6.) In another, the pedestrian somehow fell, "allowing his left leg to be run over by the steer wheels . . . ." (Doc. No. 81-8 at 3.) The final two incidents appear to be the result of operator inattentiveness. (Doc. No. 81-8 at 5; Doc. No. 81-9 at 8.) The Court is not satisfied that this information illustrates "a high degree of similarity" permitting Dr. Freeman to opine on causation, an "ultimate issue to be decided by the jury." *Four Corners Helicopters, Inc.*, 979 F.2d at 1440.

Plaintiffs argue that Crown is unabashedly hypocritical, given that Crown repeatedly refers to the incidents as "similar." (Doc. No. 70 at 27–28.) What Plaintiffs fail to realize, however, is that Crown refers to the incidents as "similar" for purposes of illustrating how rare foot-to-steer-wheel contact is—rare in the sense that only six incidents have been documented over the span of 44 years. (*See* Doc. No. 61-8 at 11.) This use of the incidents stands in stark contrast to Plaintiffs' and Dr. Freeman's, which is to establish that the RC5500's design *causes* such injuries in "9.6 out of 10.6 cases, or 90.6% of the cases." (*Id.* at 12.) Because causation is an ultimate issue for the jury to decide, Plaintiffs must establish that all of the incidents relied upon by Dr. Freeman are substantially similar to a *high*

---

[5] Grisez also testified to these incidents during his depositions, but what Grisez knows of the incidents is gleaned from the accident reports. (Doc. No. 70-5 at 48–51; Doc. No. 70-10 at 7–9, 13.)

*degree* of certainty. Plaintiffs have failed to do so.[6]

The Court also finds Dr. Freeman's case-specific opinion would not assist the trier of fact. Simply put, Dr. Freeman overcomplicates simple evidence that speaks for itself: In 44 years, the RC3000 has been involved in three foot-to-steer-wheel incidents. In only six years, the RC5500 has been involved in the same number of incidents. The only apparent difference between the designs of the two models as it relates to the steer wheels is that the former has a full wrap-around skirt, and the latter does not. A reasonable jury does not need an epidemiologist to tell them the inference that can be drawn from these facts. For these reasons, the Court finds Dr. Freeman's case-specific opinion lacks the relevance required for admissibility or appropriate methodology for a reliable result. However, the facts of "similar" injuries between the RC5500 and its predecessors are admissible, given the issues of exposure to the steer wheels, as well as, notice and foreseeability under the negligence claim.

In sum, the Court finds Dr. Freeman is qualified to offer the opinions included in his report. However, both his general opinion and case-specific opinion lack the required relevance, albeit for different reasons. As such, the Court **GRANTS** Crown's motion and **EXCLUDES** Dr. Freeman's testimony.

## II. *Motion for Summary Judgment*

Crown argues it is entitled to summary judgment on both products liability claims.

---

[6] Admittedly, at least one incident sounds quite similar to Nathan's accident. There, the forklift operator entered the aisle where the pedestrian was taking inventory, driving in the forks trailing direction. (Doc. No. 81-8 at 5.) "As he was entering, he turned his head to check the load on the forks. When he turned back around[,] he struck [the pedestrian,] trapping her foot under the [] steer wheels." (*Id.*) Even if this one incident is substantially similar, that the same cannot be said of the four others markedly undercuts Dr. Freeman's causation analysis given the small sample size. Dr. Freeman himself admits that removing even one incident renders the risk ratio statistically insignificant. (Doc. No. 76-2 at 4 ("So knock one of these events off and take this down to a risk ratio of seven or six, it won't be statistically significant. So the three kind of put it over the top where we say, oh, I don't think this is random effect.").)

It asserts that Plaintiffs have failed to come forward with competent proof that the RC5500 was defectively designed or that the alleged defect proximately caused Nathan's injuries. (Doc. No. 63-1 at 19–22.) Finally, Crown argues that Plaintiffs have presented no evidence of negligence. (*Id.* at 24.)[7]

## A. Legal Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Id.*

A party seeking summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322–23.

If the moving party carries its initial burden, the burden of production shifts to the nonmoving party to set forth facts showing a genuine issue of a disputed fact remains. *Id.* at 330. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

---

[7] Plaintiffs object to Crown's reliance on evidence of Nathan's and Manrique's comparative fault, the RC5500's compliance with industry standards, and the opinion of the Cal/OSHA investigator. (Doc. No. 81 at 22–23.) To the extent the Court touches on this evidence in its analysis, Plaintiffs' objection is **OVERRULED**. To the extent the evidence plays no part in the Court's analysis, Plaintiffs' objection is **OVERRULED AS MOOT**.

1   //

2   **B.    Strict Products Liability Based On Design Defect**

3       Plaintiffs' first cause of action is for strict products liability. (Doc. No. 21 ¶¶ 18–31.)

4   A federal court sitting in diversity applies state law to such claims. *Stilwell v. Smith &*

5   *Nephew, Inc.*, 482 F.3d 1187, 1193 (9th Cir. 2007). Under California law, Plaintiffs must

6   present substantial evidence that (1) Crown manufactured the RC5500, (2) the RC5500

7   was defective in its manufacture or design, (3) the defect existed when the RC5500 left

8   Crown's possession, (4) the defect was the cause of Nathan's injury, and (5) Nathan's

9   injury was caused by a use of the RC5500 that was reasonably foreseeable to Crown.

10   *Stephen v. Ford Motor Co.*, 134 Cal. App. 4th 1363, 1370 (2005). Crown focuses its

11   arguments on whether the RC5500 was defectively designed and whether the steer wheel

12   opening caused Nathan's injury.

13       "A manufacturer may be held strictly liable for placing a defective product on the

14   market if the plaintiff's injury results from a reasonably foreseeable use of the product."

15   *Saller v. Crown Cork & Seal Co.*, 187 Cal. App. 4th 1220, 1231 (2010). Products liability

16   may be premised on a theory of design defect, manufacturing defect, or failure to warn. *Id.*

17   Here, Plaintiffs seek to hold Crown strictly liable under the theory of design defect. Such

18   a defect exists when the product is built in accordance with its intended specifications, but

19   the design itself is inherently defective. *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 429

20   (1978). The California Supreme Court has recognized two tests for proving design defect:

21   the "consumer expectation test" and the "risk-benefit test." *Id.* at 432.

22       Under the consumer expectation test, a product is defective if the plaintiff establishes

23   that "the product failed to perform as safely as an ordinary consumer would expect when

24   used in an intended or reasonably foreseeable manner." *Id.* at 429. Plaintiffs do not assert

25   design defect based on the consumer expectation test. (Doc. No. 81 at 11.)

26       The risk-benefit test "involves an evaluation of the design itself." *Campbell v. Gen.*

27   *Motors Corp.*, 32 Cal. 3d 112, 118 (1982). Under this test, "a product [is] defective in

28   design . . . if through hindsight the jury determines that the product's design embodies

'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design." *Barker*, 20 Cal. 3d at 430. To prevail under the risk-benefit test, "the plaintiff [must] make[] a prima facie showing that the injury was proximately caused by the product's design[.]" *Campbell*, 32 Cal. 3d at 119. If the plaintiff satisfies his prima facie burden, the burden "shift[s] to the defendant to prove, in light of the relevant factors, that the product is not defective." *Id.*

### 1. Plaintiffs' Prima Face Burden

As stated above, Plaintiffs carry the initial burden of showing the product's design proximately caused Nathan's injury. *Id.* A defect is a proximate or "legal cause of injury only when it is a substantial factor in producing the injury." *Soule v. Gen. Motors Corp.*, 8 Cal. 4th 548, 572 (1994) (citing *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1048–54 (1991)). "A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm. It must be more than a remote or trivial factor. It does not have to be the only cause of the harm." *Raven H. v. Gamette*, 157 Cal. App. 4th 1017, 1025 (2007) (citation omitted). However, if the plaintiff's injury would have occurred even in the absence of the defect in design, the defect cannot be considered a substantial factor in bringing the injury about. *Soule*, 8 Cal. 4th at 572.

Crown argues Plaintiffs have failed to meet their prima facie burden because there is no evidence that Nathan's injury was caused by the inclusion of the steer wheel opening. (Doc. No. 63-1 at 21.) Crown also argues that Plaintiffs have not provided evidence from which "a juror could reasonably conclude that the wheel cutout contains dangers which outweigh its benefits." (*Id.* at 19.) Crown finally argues that "Plaintiffs have not, and cannot [*sic*] show that any of their proposed alternative designs would have prevented [Nathan] from suffering serious injury." (*Id.* at 22.)

As an initial matter, Crown is mistaken as to Plaintiffs' burden. It is not, as Crown contends, Plaintiffs' burden to establish that the risks associated with the steer wheel opening outweigh its benefits or that an alternative design would have prevented the accident or Nathan's injury. Rather, it is Plaintiffs' burden to show that the opening was a

substantial factor in bringing about Nathan's injury. *Campbell*, 32 Cal. 3d at 119; *see also Ramirez*, 2017 WL 1229739, at *2 ("the feasibility of alternative safety devices is irrelevant under the consumer-expectations test and, under the risk-benefit test, the *defendant* bears the burden to prove the lack of feasible safety devices" (citing *Chavez v. Glock, Inc.*, 207 Cal. App. 4th 1283, 1303 (2012) (emphasis in original)); *Lunghi v. Clark Equip. Co.*, 153 Cal. App. 3d 485, 497–98 (1984) (finding plaintiffs were "correct in asserting that it was not their burden to show that the risks involved in the [product's] design—the lack of mechanical safety devices, or of a warning—outweighed the benefits of these aspects of its designs").

Crown asserts "[i]t is undisputed that a pedestrian's foot is able to come into contact with the steer wheels of a lift truck regardless of whether it is designed with a steer wheel cover." (Doc. No. 63-1 at 21.) It points to Smith's deposition testimony as evidence of this, during which Smith admitted it is "possible" for a foot to contact the steer wheels, even with a cover plate and bumper attached to the forklift, where the pedestrian is knocked over. (Doc. No. 65-12 at 5.) Grisez similarly agreed that the clearance between the guard skirt and ground itself permits access to the steer wheels. (Doc. No. 65-2 at 4; Doc. No. 65-3 at 9.) Grisez based this assertion on the fact that the models preceding the RC5500, which did not contain a steer wheel opening, nonetheless had been involved in three incidents where a pedestrian's foot made contact with the wheels. (Doc. No. 65-3 at 9; *see* Doc. No. 81-8.) Photographs Plaintiffs submitted support Grisez's contention that even without the opening, a pedestrian's foot could still access the steer wheels. (Doc. No. 81-3 at 8.)

However, having reviewed the evidence in the record, the Court is satisfied that Plaintiffs have come forward with sufficient proof from which a reasonable jury could conclude that the steer wheel opening was more than a trivial factor in causing Nathan's injury. Significantly, prior to including the steer wheel opening in the guard skirt, only three foot-to-steer-wheel incidents occurred over the span of 44 years. (Doc. No. 81-17 at 21; *see* Doc. No. 81-8.) After introducing the steer wheel opening, it took only six years to attain the same number of incidents. (Doc. No. 81-17 at 21; *see* Doc. No. 81-9.) Given that

22

the only difference in the forklift's design with regard to the guard skirt and steer wheels is the opening, a reasonable jury could infer that the increase in such incidents is attributable to the opening.

This inference is strengthened by other evidence in the record. For example, Crown's expert asserts that Nathan's foot was not flat on the ground when it made contact with the steer wheels.[8] (Doc. No. 80-5 at 3.) A reasonable jury could look at an exemplar of the type of boot Nathan wore that day and a photo of the steer wheel opening, and conclude that because Nathan's foot was angled and could have caught on the guard skirt had the skirt fully enclosed the RC5500, Nathan's foot would not have been able to access the steer wheels through the four-inch clearance. This showing is sufficient to carry Plaintiffs' prima facie burden because the circumstances of the accident are of sufficiently "common knowledge that [persons] of ordinary education could reach a conclusion as intelligently as" an expert witness. *Campbell*, 32 Cal. 3d at 124 (quoting *People v. Cole*, 47 Cal. 2d 99, 103 (1956) (alterations in original)); *see also Ramirez*, 2017 WL 1229739, at *2 ("Ramirez's testimony established causation under both [the consumer expectation and risk-benefit] tests. In opposing summary judgment, Appellants offered Ramirez's testimony that her hand was 'yanked' into the grinder's moving blades after she opened the lid. This testimony is sufficient to establish causation.").

Even if, as Crown contends, this is an accident so far beyond common knowledge that Plaintiffs must provide expert testimony to carry their burden, Plaintiffs have done so. A review of Smith's report shows that, while injury is still "possible" had the steer wheel opening not been part of the RC5500's design, blocking access to that opening significantly reduces the risk of a foot coming into contact with the steer wheels. As Smith's report illustrates, where the opening is not covered, a foot can readily come into contact with the

---

[8] In their opposition to Crown's motion to exclude Smith, Plaintiffs stated it is "undisputed" that Nathan's foot was flat on the ground when it contacted the steer wheels. (Doc. No. 69 at 17.) Given Crown's expert's testimony to the contrary, the Court does not agree with Plaintiffs' assertion.

steer wheels at any angle. (Doc. No. 65-14 at 30.) Closing the opening with a cover plate, however, limits access to the crush point for several angles. (*Id.* at 30–31.) Adding a two-inch bumper to the guard skirt or a moveable guard to the steer wheel similarly limits access to the wheels. (*Id.* at 32–33.)

Crown nonetheless asserts that Nathan's injury could not have been prevented by a change in design. (Doc. No. 63-1 at 22.) Rather, Crown attributes the accident and Nathan's resulting injury to Nathan's and Manrique's conduct. (*Id.*) This argument is not well taken. It is clear under California law that a "manufacturer cannot avoid its continuing liability for a defective product even when the plaintiff's own conduct has contributed to his injury." *Daly v. Gen. Motors Corp.*, 20 Cal. 3d 725, 737 (1978). In such a case, the plaintiff's loss is equitably apportioned among all the parties at fault. *Id.* at 736–38. Here, while the jury may ultimately find that Nathan's recovery should be reduced commensurate to his and Manrique's conduct, this is not a complete bar to recovery at the summary judgment stage. *Chavez*, 207 Cal. App. 4th at 1308 ("While a jury may well find Chavez's conduct [in leaving a loaded gun with no safety in his truck where his child was able to reach it] substantially contributed to the accident [of his child inadvertently shooting him in the back] . . . , we cannot say that conduct, even if sufficient to establish criminal storage of a firearm, absolves [defendants], as a matter of law, from all liability for a design defect that may otherwise be shown to exist in the Glock 21. . . . Chavez's responsibility for his own injuries is quintessentially a question for the jury." (citations omitted)).

In reviewing the record, the Court is cognizant that, "[u]nless very unusual circumstances exist, this type of claim [that a manufacturer's failure to provide a particular safety device proximately caused the plaintiff's injury] presents a factual issue which can only be resolved by the trier of fact." *Campbell*, 32 Cal. 3d at 120. No such circumstances exist here. Accordingly, the Court finds Plaintiffs have met their prima facie burden.

### 2. The Burden Shifts to Crown

Having found that Plaintiffs have carried their initial burden, the burden "shift[s] to the defendant to prove, in light of the relevant factors, that the product is not defective."

*Campbell*, 32 Cal. 3d at 119. Relevant factors include "the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design." *Barker*, 20 Cal. 3d at 431.

Crown points to the ease of access for maintenance purposes as a benefit of the steer wheel opening. (Doc. No. 63-1 at 19.) Inclusion of the opening obviates the need to lift the forklift off the ground when the steer wheels require inspection or servicing. (Doc. No. 65-5 at 3; Doc. No. 70-7 at 13; Doc. No. 70-9 at 3–5.) This eliminates the possibility of the forklift slipping and crushing a technician beneath the forklift, something that has unfortunately occurred with another manufacturer's forklift. (Doc. No. 65-5 at 3–4.) Crown also asserts that the RC5500 was designed in compliance with relevant safety standards. (Doc. No. 63-1 at 19.)

Having reviewed the parties' evidence, the Court finds that a reasonable jury could conclude that the benefits of the steer wheel opening do not outweigh its risks. There is a genuine dispute of material facts in this regard. The risks to forklift service technicians are not negligible. However, the Court cannot say those risks outweigh, as a matter of law, the risk of foot crush injuries, which are also not negligible. (Doc. Nos. 81-8, 81-9.) Furthermore, while the RC5500's compliance with safety standards is relevant, this fact does not tilt the record in Crown's favor to such a degree that the Court can grant Crown summary judgment. Simply stated, while "evidence of industry safety standards is relevant in a product liability action," *Binning v. Louisville Ladder, Inc.*, No. 2:11-cv-03058-MCE-CKD, 2014 WL 4249667, at *5 (E.D. Cal. Aug. 27, 2014) (citing *Howard v. Omni Hotels Mgmt. Corp.*, 203 Cal. App. 4th 403 (2012)), "[c]ompliance with applicable safety standards does not insulate a manufacturer from defective product claims," *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 863 (9th Cir. 2011)).

In sum, the Court finds that Crown has failed to meet its burden of proving, as a matter of fact and law, that the benefits of the steer wheel opening outweigh its risks.

Accordingly, summary judgment on Plaintiffs' strict liability claim is inappropriate.

### C.   **Negligence**

Crown asserts summary judgment in its favor on Plaintiffs' negligent design defect claim is warranted because Plaintiffs have proffered no competent evidence that Crown designed the RC5500 negligently.[9] (Doc. No. 63-1 at 23–24.) Plaintiffs retort that Crown's own admissions and Smith's testimony on the standard of care create genuine issues of material fact that the jury must decide. (Doc. No. 81 at 28–31.)

As with a design defect claim seeking to hold a designer or manufacturer liable under a strict liability theory, under a negligence theory, the plaintiff must prove a defect caused the injury. *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 479 (2001). However, "[u]nder a negligence theory, a plaintiff must also prove 'an additional element, namely, that the defect in the product was due to negligence of the defendant.'" *Id.*; *see also Barker*, 20 Cal. 3d at 434 (stating that products liability claim predicated on negligent design theory focuses on the reasonableness of the manufacturer's conduct, not the product itself). "[T]he test of negligent design 'involves a balancing of the likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of the precaution which would be effective to avoid the harm.'" *Chavez*, 207 Cal. App. 4th at 1305 (quoting *Merrill*, 26 Cal. 4th at 479–80).

Because "'most of the evidentiary matters' relevant to applying the risk/benefit test in strict liability cases 'are similar to the issues typically presented in a negligent design case,'" for the reasons discussed above in connection with their strict liability cause of action, the Court finds summary judgment on Plaintiffs' cause of action for negligent

_____

[9] Crown also argues that summary judgment in its favor is appropriate because Plaintiffs have failed to come forward with competent evidence that the RC5500 was defectively designed and that such defect caused Nathan's injury. (Doc. No. 63-1 at 22–23.) However, as discussed in the preceding section, the Court finds Plaintiffs have carried their prima facie burden on these elements. *See supra* Discussion Section II.B.1.

design is not warranted. *Id.* (quoting *Merrill*, 26 Cal. 4th at 479–80). Accordingly, the Court **DENIES** Crown's motion for summary judgment.

## CONCLUSION

In sum, the Court rules as follows: (1) Crown's motions to exclude the testimony of Fred Smith and Eugene Vanderpol II are **DENIED**, (Doc. Nos. 59, 62); (2) Crown's motion to exclude the testimony of Dr. Michael Freeman is **GRANTED**, (Doc. No. 61); and Crown's motion for summary judgment is **DENIED**, (Doc. Nos. 63, 65.) The Court will issue a case scheduling order resetting the pretrial dates forthwith.

**IT IS SO ORDERED.**

Dated: May 15, 2017

Hon. Anthony J. Battaglia
United States District Judge

15-CV-0972-AJB-WVG